IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 20, 2009 Session

**STATE OF TENNESSEE v. JAMES RAY BARTLETT**

**Direct Appeal from the Circuit Court for Lincoln County**
**No. S0800007     Robert Crigler, Judge**

**No. M2008-02408-CCA-R3-CD - Filed September 7, 2010**

Following a jury trial, Defendant, James Ray Bartlett, was convicted of five counts of aggravated burglary, a Class C felony, four counts of theft of property valued between $1,000 and $10,000, a Class D felony, two counts of theft of property valued under $500, a Class A misdemeanor, one count of vandalism of property valued between $500 and $1,000, a Class E felony, and four counts of vandalism of property valued under $500, a Class A misdemeanor. The trial court sentenced Defendant as a Range III, persistent offender, to ten years for each aggravated burglary conviction. The trial court sentenced Defendant as a Range III, career offender to twelve years for each theft of property valued between $1,000 and $10,000 and to six years for his Class E felony conviction. The trial court sentenced Defendant to eleven months, twenty-nine days for each misdemeanor conviction. On appeal, Defendant argues that: (1) the trial court erred in not conducting a hearing on Defendant's motion to suppress; (2) the trial court erred in denying Defendant's motion to disqualify the District Attorney General's office from prosecuting this case; (3) the trial court erred by dismissing an African-American prospective juror from the panel pursuant to a peremptory challenge by the State; (4) the trial court erred in failing to grant Defendant's motion for a mistrial; (5) the evidence is insufficient to support Defendant's convictions of aggravated burglary and vandalism; and (6) the trial court erred in determining that Defendant was a career offender for purposes of sentencing him in counts 6, 8, 10, 14, and 18 of the indictment. After review, we conclude that there is a conflict between the transcript of the sentencing hearing and the judgment forms concerning the trial court's imposition of consecutive sentencing. We accordingly remand to the trial court for correction of the judgments to accurately reflect the effective sentence of thirty years intended by the trial court. In all other aspects, the judgments of the trial court are affirmed.

**Tenn. R. App. P. Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Melissa L. Thomas, Fayetteville, Tennessee, for the appellant, James Ray Bartlett.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Charles Frank Crawford, Jr., District Attorney General; Ann L. Filer, Assistant District Attorney General; Hollyn Eubanks, Assistant District Attorney General; and Benjamin A. Whitehouse, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

Murel Tucker testified that in December 2007 he lived at 287 Stevens Creek Road in Lincoln County. When he returned home from work on December 13, 2007, Mr. Tucker discovered that the window on his back door was broken out in the lower right-hand corner. Mr. Tucker discovered two watches missing from a wooden jewelry box in his bedroom. Mr. Tucker said that the watches cost less than $100, and it cost approximately $150 to repair his back door. On January 3, 2008, Mr. Tucker found his watches among the items discovered in the back of Defendant's red Ford Ranger pick-up truck.

Roger Hargrove testified that in 2007 he lived at 154 South Fishing Ford Road in Lincoln County. Mr. Hargrove returned home from a business trip on December 19, 2007, and discovered several open closet doors. A safe was missing from one of the closets, and the gun cabinet had also been pried open. Mr. Hargrove continued to the rear of the house and noticed that a window had been broken out and the back door was damaged. The perpetrator had also opened the refrigerator in Mr. Hargrove's office and flung soda over the walls, ceiling and floor.

Mr. Hargrove stated that a number of items were missing from his home including several guns, a knife collection, watches, and a wedding band. Mr. Hargrove stated that the value of the stolen property was approximately $3,800. Mr. Hargrove said that it cost approximately $375 to repair the back door, approximately $300 to repair the window, and approximately $200 to repair his gun cabinet. At trial, he identified two hunting knives which had been recovered from the back of Defendant's truck by the Lincoln County Sheriff's Department. Mr. Hargrove said that the knives were distinctive because one of the knives had a notch on the blade and the other one had a broken tip.

Daniel Walter Kosik testified that he hunted deer on property owned by Hugh Dickey on Champ Road in Lincoln County. A rental house was also located on the property. Mr. Kosik drove to the Champ Road property at approximately 2:20 p.m. on January 3, 2008, to go hunting. As he approached the rental house, he observed a red Ford pick-up truck driving down the driveway "at a fairly abnormally fast pace." The truck turned left on to Champ Road and passed Mr. Kosik's vehicle. The truck then turned right on Massey Hill Road. Mr. Kosik said that two Caucasian men were in the vehicle, and the driver was wearing a camouflage jacket. Mr. Kosik stated that there were several items in the back of the truck.

Hugh Dickey testified that Steven and Tiffany McKee rented the house located on his property on Champ Road. Mr. Dickey said that the McKees were temporarily staying with Mr. McKee's parents because Mr. McKee had broken his leg. On January 3, 2008, Mr. Kosik told Mr. Dickey that he had seen a red pick-up truck driving away from the house, and the two men briefly looked around the back of the property but did not detect any disturbance to the property. Ms. McKee returned to the property to feed her dogs as Mr. Dickey was leaving. In a few minutes, Ms. McKee called Mr. Dickey on his cell phone and told him that the house had been broken into.

Ms. McKee testified that after Mr. Dickey drove away, she discovered a broken window pane in the front door. Ms. McKee stated that several items were missing from her home including a laptop computer, some blankets, a back massager, all of her jewelry, Mr. McKee's knife collection, a knife with a compass in the handle, a space heater, a glucose meter, a duffle bag, three pairs of Mr. McKee's cowboy boots, one pair of her cowboy boots, and two belt buckles, one engraved with Mr. McKee's name. Ms. McKee said that the guest room was in disarray with papers from a filing cabinet strewn across the floor, the bed unmade, and the closet doors ripped off the track. Ms. McKee said that it appeared that the vacuum cleaner had been used to break the glass in the curio cabinet, but nothing had been taken from the cabinet. Ms. McKee estimated that it would cost approximately $800 to fix the curio cabinet and estimated the value of the stolen items to be in excess of $2,000. Ms. McKee said that she found several of her stolen items among the items discovered in the back of Defendant's truck.

Kenny Clark testified that his home located at 136 Lincoln Loop Road in Lincoln County was broken into on January 3, 2008. Mr. Clark stated that several items had been stolen including jewelry, a computer hard drive, a shotgun, a camcorder, three pairs of cowboy boots, a safe, a battery charger, the money from his children's piggy banks, a back massager, and an electric blanket. Mr. Clark said that the master bedroom was in disarray with drawers pulled out, the bed sheets thrown on the floor, and the closet rifled through. Mr. Clark estimated the value of the stolen items at approximately $1,100, and he said that

it cost approximately $400 to repair his back door. Mr. Clark stated that he recovered some of his property from the items found in the back of Defendant's pick-up truck.

Robert Vlasics testified that he owned a farm on Cooper Branch Road in Lincoln County although his primary residence was located in Huntsville, Alabama. Mr. Vlasics said that he usually spent two or three days a week at the Lincoln County farm. Mr. Vlasics detected signs that someone had been on his property in his absence in mid-December 2007. He secured the residence's windows, installed padlocks on his garage, and removed all of the weapons from the property except for a .22 caliber semi-automatic rifle. Mr. Vlasics recorded the rifle's serial number and left it leaning against the wall by the kitchen door when he returned to Alabama on December 29, 2007.

Mr. Vlasics said that the entrance to his property was secured by a metal gate with a padlock. Mr. Vlasics returned to the farm on January 4, 2008, and discovered the metal gate laying on the ground. An inspection of the property revealed that the glass panel in a side door to the garage was broken out, the garage had been ransacked, and several items were missing including some Budweiser and Grosch beer. A full-length window by the kitchen was broken, and several items were missing from the house including the .22 caliber rifle. Mr. Vlasics said that it cost approximately $1,900 to repair the windows, and he estimated the value of the stolen items to be over $3,000. Mr. Vlasics stated that several of his items were recovered by the Lincoln County Sheriff's Department from the back of Defendant's truck, including the .22 caliber rifle.

Sergeant Milton Eugene Binkley with the Franklin County Sheriff's Department testified that he initiated a traffic stop of a red 1994 Ford Ranger pick-up truck at approximately 7:22 p.m. on January 3, 2008, after observing the vehicle being driven in a reckless manner. Sergeant Binkley said that when he approached the vehicle, the driver was leaning over the floor board pouring out a can of beer. Sergeant Binkley identified Defendant as the vehicle's driver from his driver's license. Sergeant Binkley said that the back of the pick-up truck contained numerous items including several guns and knives. Sergeant Binkley ran the serial numbers of the guns, including a .22 caliber semi-automatic rifle, through the National Crime Information System ("NCIC"), but he did not discover that any of the items in Defendant's truck had been reported as stolen.

Sergeant Binkley placed Defendant under arrest for driving under the influence. The contents of the vehicle were inventoried, and the truck was towed to a local towing company's secured lot. Sergeant Binkley said that Defendant was released from the county jail at some point on January 4, 2008, and his truck was returned to him.

James Stanley Owen, an investigator with the Lincoln County Sheriff's Department, testified that a series of burglaries had been committed in the county during December 2007 and early January 2008. Investigator Owen said that he responded to the call about the burglary at Mr. Vlasick's farm on January 3, 2008. Investigator Owen said that Mr. Vlasics telephoned the department on January 4, 2008, and provided the serial number of the .22 rifle which had been taken from his home. Investigator Owen ran the serial number through NCIC and discovered that the serial number of the rifle had been checked through NCIC on January 3, 2008, by the Franklin County Sheriff's Department.

Defendant was arrested on January 4, 2008, based on the information provided by the Franklin County law enforcement officials. After Defendant was escorted to the Lincoln County Sheriff's Department, Investigator Owen read Defendant his *Miranda* rights, and Defendant executed a written waiver of his rights. Defendant also executed a written consent to search his truck. A redacted videotape of Defendant's statement was played for the jury. In his statement, Defendant acknowledged that he had committed the burglaries on Stevens Creek Road, South Fishing Ford Road, Champ Road, Lincoln Loop Road, and Cooper Branch Road in Lincoln County. Defendant told Investigator Owen that he acted alone, and all of the items taken during the burglaries were in the back of his pick-up truck.

Investigator Owen said that Defendant's girlfriend, Judy Smith, met him at the Sheriff's Department the week after Defendant's arrest with some of Defendant's personal items. Ms. Smith told Investigator Owen that she and Defendant had broken up, and she wanted all of his property out of the house. Mr. Vlasics' clock was included among the items Ms. Smith said belonged to Defendant. Investigator Owen stated that Mr. Tucker, Mr. Hargrave, Ms. McKee, Mr. Clark, and Mr. Vlasics each identified some of the items which had been stolen from their houses from the items in the back of Defendant's truck. Investigator Owen said that Defendant was wearing a pair of Mr. Clark's boots when he was arrested. Ms. McKee's locket containing her father's photograph was among the items in Defendant's truck. Defendant told Investigator Owen that the person in the photograph was one of his "kinfolk."

On cross-examination, Investigator Owen acknowledged that no fingerprints were taken from the burglarized homes. Investigator Owen stated that he was aware that Defendant had been involved in an automobile wreck around December 20, 2008. Investigator Owen said that Defendant's injuries had healed but were visible when he was arrested. Investigator Owen acknowledged that he had also arrested Larry Dean Taylor in connection with the burglaries. Investigator Owen said that he did not search Mr. Taylor's residence because Defendant told him that all of the stolen items were in Defendant's truck. On redirect examination, Investigator Owen said that Mr. Taylor had undergone a mental valuation before Defendant's trial, and Mr. Taylor was found incompetent to stand trial.

Deputy Tull Malone with the Lincoln County Sheriff's Department, testified that he and Deputy Mike Pitts went to Defendant's residence in Flintville on January 4, 2008. Deputy Malone said that Defendant's red Ford truck was parked in the driveway in front of the mobile home. Deputy Malone and Deputy Pitts knocked on the mobile home's front door, and a woman opened the door. Defendant was sitting on the couch. The woman told Deputy Malone that she and Defendant had dated in the past, and Defendant had "just show[n] up at her house." Deputy Malone stated that he and Deputy Pitts photographed and inventoried the contents of Defendant's truck after it was towed to the Sheriff's Department.

Sheriff Murray Blackwelder testified that he escorted Defendant outside the Sheriff's Department for a cigarette break after Defendant's interview was concluded. While they were on the front porch, an officer asked Defendant if he had anything on him that should be removed before he went through booking. Defendant reached into one of his pockets and brought out a handful of jewelry. He handed it to Sheriff Blackwelder and said, "Well, you need to take this." Sheriff Blackwelder stated that the victims of the burglaries later identified some of the pieces of jewelry in Defendant's pocket as theirs.

The State rested its case-in-chief, and Defendant presented his defense. Judith Ann Smith testified that Defendant began living at her house in August 2007. Ms. Smith said that Defendant made his money by buying used automobile batteries and reselling them. Ms. Smith stated that Defendant had to stop working because of his "nerves." Ms. Smith said that Defendant was involved in a wreck around December 29, 2007, which totaled his white Chevrolet S10 truck. Ms. Smith said that Defendant suffered a head injury, broken ribs, and lacerations to his face in the wreck. Ms. Smith stated that Defendant did not leave the house from the day of the wreck until January 3, 2008. Ms. Smith said that Defendant owned a second truck which was a maroon Ford pick-up truck, but Defendant did not drive the maroon truck before January 2008 because it had a flat tire. Ms. Smith stated that she first noticed that the maroon truck had been moved on January 4, 2008.

Ms. Smith said that Defendant was so intoxicated on January 3, 2008, that he did not know where he was. Ms. Smith was afraid of Defendant and asked him to leave the house at approximately 6:00 p.m. Ms. Smith stated that she did not see Defendant again until approximately 5:20 p.m. on January 4, 2008.

Ms. Smith stated that she gave the police officers consent to search her home after Defendant was arrested, and no stolen property was found. Ms. Smith said that Investigator Owen called her a few days later and told her to bring all of the items in Defendant's gun cabinet to the department. Ms. Smith stated that she first noticed Mr. Vlasic's clock in her house on January 3, 2008. Ms. Smith said that Mr. Taylor was Defendant's cousin, and Defendant helped Mr. Taylor out by finding him small jobs. Ms. Smith said that Mr. Taylor

-6-

sold Defendant some pocket knives and a gold watch so that Mr. Taylor could earn extra money.

On cross-examination, Ms. Smith clarified that Defendant left her house on January 3, 2008, in the maroon truck. Ms. Smith acknowledged that she did not know what Defendant did during the day while she was at work from approximately 8:00 a.m. until 5:00 p.m.

Kevin Lance Bennett, Defendant's cousin, testified that he took Defendant home after his wreck on December 21, 2008. Mr. Bennett said that Defendant "was tore [sic] up from the wreck." Mr. Bennett said that he transferred the license plate on the S10 truck to the maroon Ford truck around January 3, 2008, but he could not recollect the exact date. Mr. Bennett stated that Defendant changed the Ford truck's flat tire after the license plates were switched, and then drove away.

Defendant testified that he had made as much as $1,500 in one day from reselling used automobile batteries and did not need any other source of income. Defendant said that in late November or early December 2008 he gave a statement at the Lincoln County Sheriff's Department during which he identified the individuals who had recently stolen batteries from a local business. Defendant said that after the interview, he was so nervous he could "hardly talk." Defendant stated that he had only been out of prison for approximately ten months, and he believed that the Lincoln County law enforcement officials were watching him during that period of time.

Defendant said that he wrecked his Chevrolet S10 pick-up truck on December 20, 2007. Defendant stated that he suffered a severe head injury and cuts all over his face. Defendant said he also broke his ribs and dislocated his jaw. Defendant stated that he could not walk because he had badly bruised his legs on the steering wheel. Defendant added that he stayed at home for two weeks without leaving. Defendant said that he believed he bought the maroon Ford truck at the end of November or the first of December 2007, and he first drove the truck on January 3, 2008.

Defendant testified that Larry Taylor was his cousin and that Mr. Taylor pretended to be "slow" because "that gets him out of trouble." Defendant said that Mr. Taylor always needed money to buy Methadone, and Defendant paid him seven dollars an hour to help Defendant in his battery business. Defendant said that he bought a Bolivar watch and a Rolex watch from Mr. Taylor on either December 19, 2007, or December 20, 2007. Defendant paid Mr. Taylor $25 for the Rolex watch. Defendant said that Mr. Taylor gave him two knives and told Defendant that they had belonged to Defendant's brother.

Defendant stated that these knives were the ones that had been stolen from Mr. Hargrave's residence.

Defendant said that on January 3, 2008, he and Mr. Taylor ran several errands during the day and stopped twice to buy beer. At one point, Defendant stopped to pawn a rifle and a crossbow. Defendant stated that Mr. Taylor had a bag of jewelry in his coat pocket. Defendant added the jewelry to his pawn ticket so that the salesperson would not have to make out two tickets. Defendant said that he did not clearly remember what happened after approximately 4:00 p.m. However, at one point, he remembered looking down and seeing Mr. Vlasic's clock in his lap. Defendant said that he took the clock into his house and placed it by the front door. Defendant stated that he was so intoxicated he could run, but he could not walk. Defendant believed that Mr. Taylor had put methadone in his beer. Defendant did not remember going to Mr. Vlasics' farm on January 3, 2008. Defendant explained that Mr. Taylor was driving on January 3, 2008, and Defendant was riding in the passenger seat. Defendant stated that he noticed the items in the back of the Ford pick-up truck, and he thought the items came out of Mr. Taylor's "storage bin."

Defendant stated that Investigator Owen threatened to arrest Ms. Smith if Defendant did not confess to committing the burglaries. Defendant said that he only gave a statement because he did not want to involve Ms. Smith in something he did not do. Defendant explained that he did not tell Investigator Owen that Mr. Taylor was with him that day because he did not want to put Mr. Taylor "in the middle of something because of his age and stuff."

Defendant acknowledged that he had four theft convictions in 1990. Defendant explained that he was in jail when he learned that his father was dying. Defendant stated that he escaped from the jail and stole a number of vehicles during the trip to his father's home. Defendant said, "I got in one car [and] went down the road, and I left it, and I got in another car and went down the road . . . and that's what proceeded until I got to Corders Crossroads out there." Defendant said that he "made sure that they [the owners] got the cars back."

On cross-examination, Defendant stated that he was familiar with the area in which the burglaries were committed because he lived in Kelso. Defendant acknowledged that the judgment forms reflected that three of the four 1990 theft convictions were committed on different days. Defendant explained that there was a delay in reporting the theft offenses. Defendant acknowledged that he made a statement in his 1990 presentence report that the four theft offenses were committed while he and two other men were riding around and drinking. Defendant explained, however, that this portion of his statement concerned burglary charges which were later dismissed.

## II. Trial Court's Refusal to Hear Defendant's Motion to Suppress

Defendant argues that he timely filed a motion to suppress his videotaped statement, which Defendant contended was the product of coercion, on July 17, 2008, pursuant to Rule 12 of the Tennessee Rules of Criminal Procedure. *See* Tenn. R. Crim. P. 12(b)(2)(C) (providing that motions to suppress must be filed "before trial"). Accordingly, Defendant contends that the trial court erred which it refused to hear his motion. The State argues that Defendant has waived this issue by failing to include it in his motion for new trial and by failing to file his motion to suppress within the time set by the trial court.

In his motion for new trial, Defendant challenged only the sufficiency of the convicting evidence and the trial court's denial of his motion for a mistrial. At the hearing on his motion for new trial, Defendant did not address any issues but the two issues presented in his new trial motion. An issue as to the admission of evidence at trial must be "specifically stated in a motion for a new trial" as a predicate to appellate review. Tenn. R. App. P. 3(e). Failure to do so waives that issue for purposes of appellate review. *Id*. Accordingly, we conclude that Defendant has waived this issue.

## III. *Batson* Challenge

Defendant argues that the trial court erred in allowing the State to exercise a peremptory challenge to exclude Derrick Hockett, an African-American, from the jury without offering an adequate race-neutral basis for his exclusion. As the State submits in its brief, Defendant did not raise this issue in his motion for new trial, and this issue is therefore waived. Tenn. R. App. P. 3(e). Nonetheless, waiver issues aside, Defendant has failed to show that the trial court breached a clear and unequivocal rule of law or that plain error review is "necessary to do substantial justice." Tenn. R. App. P. 36(b); *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (citing *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)).

Plain error requires that five factors be established: (1) "the record must clearly establish what happened in the trial court"; (2) "a clear and unequivocal rule of law must have been breached"; (3) "a substantial right of the accused must have been adversely affected"; (4) "the accused did not waive the issue for tactical reasons"; and (5) "consideration of the error is necessary to do substantial justice." *Adkisson,* 899 S.W.2d at 641-42.

In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712 (1986), the Supreme Court held that the State's exclusion of potential jurors based solely upon race violates the Equal Protection Clause of the Fourteenth Amendment. *Batson,* 476 U.S. at 89. There are three

prerequisites that must be met in order to establish a *Batson* violation: (1) the Defendant must establish a prima facie case of purposeful discrimination; (2) the State must be given the opportunity to rebut the prima facie case by offering a race-neutral explanation for the exercise of the peremptory challenge; and (3) the trial court must then determine whether the Defendant has established purposeful discrimination. *Id.* at 96-98.

Although the State's race-neutral explanation must be reasonable and specific, there is no requirement that it be persuasive or plausible. *Id.* at 98; *Purkett v. Elem,* 514 U.S. 765, 767-68, 115 S. Ct. 1769 (1995); *see also State v. Hugueley,* 185 S.W.3d 356, 368 (Tenn. 2006). Essentially, "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." *Elem,* 514 U.S. at 768; *see also Hugueley,* 185 S.W.3d at 368. However, the trial court must consider the explanation in light of all of the evidence to insure that the explanation is not pretextual. *Miller-El v. Dretke,* 545 U.S. 231, 251-52, 125 S. Ct. 2317 (2005); *Hugueley,* 185 S.W.3d at 369. The trial court is in the position to judge the credibility of both the potential jurors and counsel because the trial court has the opportunity to observe their demeanor. *Smith,* 893 S.W.2d at 914. Therefore, "[o]n appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Snyder v. Louisiana,* 552 U.S. 472, 477, 128 S. Ct. 1203 (2008); *see also Hugueley,* 185 S.W.3d at 359.

During voir dire, Defendant objected to the State's exercise of a peremptory challenge to excuse Mr. Hockett from the venire. The State provided the following basis for the challenge:

> [THE STATE]: There has [sic] been several members of the Hockett family that have been in trouble. As a matter of fact, I've had an ongoing bad relationship with some members of that family. And I don't know how closely they're related to this gentleman or not. But it's my belief that all the Hocketts are related, and it has nothing to do with Mr. Hockett's race, only the fact that several of his family members have been in trouble.

> THE COURT: All right. Well, the Court is familiar with that name being on the Court's docket. And that is a sufficient race neutral reason, so I respectfully overrule your objection.

We conclude that the evidence supports the trial court's findings. The State explained its reasons for striking Mr. Hockett from the jury panel, and the trial court was familiar with the concerns expressed by the State. From our review, we conclude that there

is no inherently discriminatory intent shown. Defendant has failed to show that a clear and unequivocal rule of law was breached, and he is not entitled to relief on this issue.

## IV. Conflict of District Attorney's Office

Defendant argues that the trial court erred when it continued to allow the District Attorney General's office to prosecute him after Defendant notified the trial court that he had sued District Attorney General Charles Crawford and Assistant District Attorney General Ann Filer in 2002 in federal district court alleging violation of his civil rights. *See* 42 U.S.C. § 1983. Once again, however, Defendant failed to raise this issue in his motion for new trial, and the issue is thus waived. *See* Tenn. R. App. P. 3(e).

Nor has Defendant shown that he is entitled to plain error relief. The determination of whether to disqualify the office of the District Attorney General in a criminal case rests within the discretion of the trial court. Appellate review of such a ruling is limited to whether the trial court has abused its discretion. *See State v. Culbreath,* 30 S.W.3d 309, 312 (Tenn. 2000); *State v. Tate,* 925 S.W.2d 548, 550 (Tenn. Crim. App. 1995). According to the documents attached to his motion to disqualify the district attorney's office, the federal district court disposed of the lawsuit nearly six years before Defendant's trial by *sua sponte* dismissing defendants Crawford and Filer in case no. 4:02-cv-74 based on their immunity from suit, and granting the State's motion to dismiss as to the other defendants. We note that Defendant also filed a *pro se* complaint in 2002 in the Lincoln County circuit court entitled "Civil Conspiracy to Violate State Statutory Law" against, among others, Assistant District Attorney General Filer. *See James Ray Bartlett v. Gail Corder*, *et. al.*, No. M2003-00863-COA-R3-CV (Tenn. Ct. App., June 17, 2004), *perm. to appeal denied* (Tenn. Oct. 29, 2004). The appellate court affirmed the trial court's dismissal of Defendant's complaint for failure to state a claim for which relief can be granted. *Id*.

At the hearing on Defendant's motion to disqualify, Defendant argued only that the district attorney general's office "may have a revenge motive against him." The following colloquy then occurred:

> [THE STATE]: I would just state that until this motion [to disqualify] reared its head, Your Honor, [neither] Ms. Filer nor I had any idea that [Defendant] had sued us. We'd never been served with any lawsuit, didn't have any notion. How that could have affected us, I can't imagine. This is the first we've ever heard of such a suit.

[THE COURT]: Well, I don't think the law's reached a point that a defendant can just – can sue somebody and automatically disqualify the DA's Office or a Judge for that matter, otherwise as soon as somebody's indicted, they can file a lawsuit and then disqualify. And I guess theoretically, it can go on ad infinitum.

At the conclusion of the hearing, the trial court denied Defendant's motion.

Although Defendant alleges that the trial court's denial of his motion allowed "an air of revenge on the part of the individuals representing [the] State to pervade to the defendant and his family and friends," Defendant has failed to show that the prosecutors acted in order to punish him for pursuing his legal rights, and the record does not indicate any likelihood of vindictiveness. Thus, we conclude that the trial court did not abuse its discretion in denying Defendant's motion to disqualify the district attorney general's office from prosecution of his case. Defendant has, therefore, failed to show that consideration of this issue is necessary to do substantial justice. *Adkisson*, 889 S.W.2d at 642. Defendant is not entitled to relief on this issue.

## V. Denial of Motion for Mistrial

Defendant argues that the trial court erred in denying his motion for a mistrial after the State allowed the jury to hear Defendant's reference to his prior incarceration during the playing of his videotaped statement to the police. Prior to trial, the trial court instructed the State to stop playing the videotape before Defendant said anything about his prior convictions or incarceration, and the jury would be sent out of the courtroom while the State fast forwarded past the incriminating statements. On one occasion, however, the State failed to stop the videotape prior to Defendant mentioning that he did not "need to go back to prison." Defendant moved for a mistrial. The trial court denied his request, finding that it was an inadvertent mistake on the part of the State. The State agreed to fast forward the videotape past the remaining discussion which included references to Defendant's past incarceration, and Defendant agreed. The trial court also gave Defendant the option of providing the jury with a curative instruction or continuing the playing of Defendant's statement without mentioning the comment. Defendant chose not to request a curative instruction, and the videotape was played without further incident.

The determination of whether to grant a mistrial rests within the sound discretion of the trial court. *State v. Smith,* 871 S.W.2d 667, 672 (Tenn. 1994). The reviewing court should not overturn that decision absent an abuse of discretion. *State v. Reid,* 91 S.W.3d

247, 279 (Tenn. 2002). The burden of establishing the necessity for mistrial lies with the party seeking the mistrial. *State v. Williams,* 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). No abstract formula should be mechanically applied in making this determination, and all circumstances should be taken into account. *State v. Mounce,* 859 S.W.2d 319, 322 (Tenn. 1993).

In *State v. Smith,* 893 S.W.2d 908 (Tenn. 1994), our Court considered three nonexclusive factors in determining whether a mistrial was warranted because of inappropriate testimony presented to the jury: (1) whether the State elicited the testimony, or whether it was unsolicited and unresponsive; (2) whether the trial court offered and gave a curative jury instruction; and (3) the relative strength or weakness of the State's proof. However, "[t]his nonexclusive list of factors offers nonmandatory guidance in the determination of whether to grant a mistrial. This Court has long held that no abstract formula should be mechanically applied to determine the propriety of a mistrial. *State v. Nash*, 294 S.W.3d 541, 546 n.4 (Tenn. 2009) (citing *State v. Dellinger,* 79 S.W.3d 458, 494 (Tenn.2002); *Mounce,* 859 S.W.2d at 322).

In the case *sub judice*, the trial court found that the State's failure to timely stop the videotape was inadvertent and not intentionally done. Further, "the trial court's offering of a curative jury instruction, and [Defendant's] refusal of the curative instruction for tactical reasons is significant to the analysis." *Nash*, 294 S.W.3d at 547 (citing *Smith*, 893 S.W.2d at 923; *State v. William Lavern Davis,* No. 01C01-9803-CC-00138, 1999 WL 5436, at *2 (Tenn. Crim. App., at Nashville, Jan.7, 1999), *no perm. to appeal filed* (holding that testimony referring to past crimes did not warrant a mistrial when the defendant declined the curative instruction and the error was "harmless in light of the overwhelming evidence" against the defendant); *State v. Pamela Maxine Bogle,* No. 86-258-III, 1987 WL 15193, at *6 (Tenn. Crim. App., at Nashville, Aug.7, 1987) (holding that a witness statement that implied that the defendant had been arrested on previous occasions should not result in a mistrial when the prosecutor did not seek to elicit evidence of past crimes, the testimony was only weakly suggestive of an arrest record, and the trial court offered a curative instruction that was declined).

In this case, the trial court offered to cure any undue prejudice caused by the brief mention of incarceration, but Defendant declined to take advantage of the trial court's offer. *See* Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party ... who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Moreover, the State's case against Defendant was strong. Defendant told Investigator Owen that he committed the burglaries and that the items in the back of his red pick-up truck were taken during the offenses. Mr. Kosik stated that he saw a red pick-up truck filled with items driving away

from Ms. McKee's home shortly before Ms. McKee discovered that her home had been burglarized. Each of the victims testified as to the property taken from their respective residences and identified some of their stolen property from the items found in Defendant's truck.

Based on our review, we conclude that the trial court did not abuse its discretion in denying Defendant's motion for a mistrial. Defendant is not entitled to relief on this issue.

We observe that Defendant also argues on appeal that the trial court erred in not granting his request for a mistrial after the State elicited testimony from Defendant during his cross-examination about a prior charged offense that was subsequently dismissed. This issue was not raised in Defendant's motion for new trial and thus is waived. Tenn. R. App. P. 3(e). Moreover, Defendant failed to make any citations in his brief to the record to support his contentions. *See* Tenn. Ct. Crim. App. R. 10(b) (stating that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court"). Thus Defendant is not entitled to relief on this issue.

## VI. Sufficiency of the Evidence

Defendant argues that the evidence is insufficient to support his five convictions of aggravated burglary, and five convictions of vandalism. Defendant submits that no evidence was presented at trial to show that he entered any of the victim's residences or that he acted with the requisite mental state to commit the crimes. When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. *State v. Black,* 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.*; *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews,* 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Aggravated burglary is defined in relevant part as entering a habitation without the effective consent of the owner and with the intent to commit a felony, theft, or assault. T.C.A. § 39-14-402(a)(1), -403(a). A habitation is defined, as "any structure ... which is designed or adapted for the overnight accommodation of persons[.]" *Id.* § 39-14-401(1)(A). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103. Vandalism is committed by "any person who knowingly causes damage to or the destruction of any real or personal property of another or of the state, the United States, any county, city, or town knowing that the person does not have the owner's effective consent." *Id*. § 39-14-408(a).

"The corpus delicti of a crime requires a showing that a certain result has been produced and the result was created through a criminal agency." *State v. Jones,* 15 S.W.3d 880, 890-891 (Tenn. Crim. App. 1999). "Whether the state has sufficiently established the corpus delicti is primarily a jury question." *Id.* at 891 (citing *Williams v. State,* 552 S.W.2d 772 (Tenn. Crim. App. 1977)). While evidence of the corpus delicti may not be established by the defendant's confession alone, only minimal or slight evidence is needed to corroborate a defendant's confession and sustain a conviction on appeal. *See State v. Buck,* 670 S.W.2d 600, 609 (Tenn.1984). The corpus delicti of the crime may be established by circumstantial evidence. *See Clancy v. State,* 521 S.W.2d 780, 783 (Tenn.1975). Direct or circumstantial evidence may therefore corroborate a defendant's confession. *See State v. Ellis,* 89 S.W.3d 584, 600 (Tenn. Crim. App. 2000). Our supreme court has further explained that "a jury [may] infer a burglary from possession of recently stolen property only when there exists a rational connection between possession and participation, when guilt more likely than not flows from possession, and, importantly, when there is some other evidence corroborating the burglary that warrants the inference." *State v. James*, __ S.W.3d __, 2010 WL 2539649, at *8 (Tenn. June 24, 2010) (footnote omitted) (citing 13 Am. Jur. 2d *Burglary* § 48 (2009)).

Viewing the evidence in a light most favorable to the State, Defendant told Investigator Owens that he committed the burglaries on Stevens Creek Road, South Fishing Ford Road, Champ Road, Lincoln Loop Road and Cooper Branch Road in Lincoln County. Defendant said that he was driving a dark red Ford pick-up truck during the burglaries, and all of the items taken during the offenses were in the back of his pick-up truck. Mr. Kosik testified that he saw a red Ford pick-up truck driving down the driveway on Champ Road at a fast rate of speed. Ms. McKee shortly thereafter discovered that her residence had been broken into and numerous personal items had been taken. Ms. McKee, along with each of the other victims found some of their stolen personal items among the items in the back of Defendant's pick-up truck. Defendant told Investigator Owen that he was alone when he committed the burglaries. Defendant explained that he had taken off his camouflage

overalls during the McKee burglary and thrown them in the back of his truck. Defendant surmised that this was why Mr. Kosik said he saw two people in the pick-up truck. Each victim testified as to the value of their stolen property and the cost to repair the damage to their respective residences inflicted during the commission of the offenses.

Based on our review, we conclude that the cumulative nature of the circumstantial and direct evidence in this case is sufficient to corroborate the statements made by Defendant, and that a rational trier of fact could find beyond a reasonable doubt that Defendant was guilty of aggravated burglary and vandalism against each of the five victims. Defendant is not entitled to relief on this issue.

## VII. Classification as a Career Offender

Defendant argues that the trial court improperly classified him as a career offender for sentencing purposes in counts 6, 8, 10, and 18 of the indictment. Defendant submits that he should have been sentenced as a persistent offender as to all counts. On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is improper. *See* T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also State v. Arnett,* 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. T.C.A. § 40-35-401(d). This presumption of correctness, however, "'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" *State v. Carter,* 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting *State v. Ashby,* 823 S.W.2d 166, 169 Tenn. 1991)). "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails," and our review is de novo. *Carter*, 254 S.W.3d at 345 (quoting *State v. Shelton,* 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992); *State v. Pierce,* 138 S.W.3d 820, 827 (Tenn. 2004)).

A trial court is mandated by the Sentencing Act to "impose a sentence within the range of punishment." T.C.A. § 40-35-210(c). A trial court, however, "is no longer required to begin with a presumptive sentence subject to increase and decrease on the basis of enhancement and mitigating factors." *Carter,* 254 S.W.3d at 346. Therefore, an appellate court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id.*

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b); *see also Carter*, 254 S.W.3d at 343; *State v. Imfeld,* 70 S.W.3d 698, 704 (Tenn. 2002).

According to the presentence report and exhibits introduced by the State without objection at the sentencing hearing, Defendant has the following prior convictions (with the indicated classifications for sentencing purposes): burglary, third degree, a Class D felony, committed on April 30, 1985; burglary, third degree, a Class D felony, committed on April 30, 1985; grand larceny, a Class D felony, committed on May 31, 1985; petit larceny, a Class E felony, committed on May 30, 1986; aggravated assault, a Class C felony, committed on November 30, 1988; aggravated burglary, a Class C felony, committed on November 18, 1990; aggravated burglary, a Class C felony, committed on November 19, 1990; theft of property between $1,000 and $10,000, a Class D felony, committed on June 6, 1990; theft of property between $1,000 and $10,000, a Class D felony, committed on June 7, 1990; theft of property between $1,000 and $10,000, a Class D felony, committed on June 7, 1990; and theft of property between $1,000 and $10,000, a Class D felony, committed on June 8, 1990. In addition, Defendant has ten prior misdemeanor convictions for driving under the influence, passing worthless checks, deceptive business practices, making false reports, and theft of property valued at less than $500. Based on his prior criminal history, the trial court sentenced Defendant as a Range III, career offender, for his Class C felony convictions of aggravated burglary in counts 1, 5, 9, 13 and 17, and as a Range III, persistent offender, for his Class D and Class E convictions.

Before addressing Defendant's challenge to the trial court's offender classification determinations, we note that there is a conflict between the judgments and the transcript of the sentencing hearing as to the manner of service of Defendant's sentences. The trial court imposed a combination of consecutive and concurrent sentences based on Defendant's extensive history of criminal activity. *See* T.C.A. § 40-35-115(b)(2). The trial court found that for each aggravated burglary conviction there was a corresponding theft and vandalism conviction. The record reflects that the trial court intended to run each theft and vandalism conviction concurrently with its corresponding aggravated burglary conviction. The trial court then stated:

[a]s to the burglary counts, as I said before, I find the defendant to be a Range III, persistent offender. The range would be 10 to 15 years. Counts 1 and 5 each have a different offense date. Counts 9, 13, and 17 were all committed on the same date. I am going to set the sentence at ten years on all of the aggravated burglary sentences. Count 5 would be consecutive to count 1. Counts 9, 13, and 17 would be concurrent with one another but consecutive to 1 and five. So it is an effective sentence of [thirty] years as a Range III, persistent offender.

On the judgment forms, however, each Class D, Class E and misdemeanor conviction is ordered to be served consecutively with either counts 1 and 5, or counts 1 and 9, and Defendant's convictions of aggravated burglary in counts 13 and 17 are each ordered to be served consecutively to counts 1 and five, for an effective sentence in excess of approximately one hundred years. When there is a conflict between the transcript and the judgment form, the transcript controls. *See, e .g., State v. Moore,* 814 S.W.2d 381, 383 (Tenn. Crim. App. 1991); *State v. Jimmy Lee Cullop, Jr.,* No. E2000-00095-CCA-R3-CD, 2001 WL 378543, at \*6 (Tenn. Crim .App., Knoxville, Apr. 17, 2001), *no perm. to appeal filed* (remanding for correction of sentence alignment in judgment form to conform to alignment reflected in transcript). Assuming that the intended effective sentence was thirty years, we remand to the trial court for correction of the judgments to accurately reflect the effective thirty-year sentence intended by the trial court.

A defendant may be sentenced as a career offender if he has received at least six prior felony convictions of any classification if the defendant's conviction offense is a Class D or E felony. T.C.A. § 40-35-108(a)(3). "Except for convictions for which the statutory elements include serious bodily injury, bodily injury, threatened serious bodily injury, or threatened bodily injury to the victim or victims, convictions for multiple felonies committed within the same twenty-four hour period constitute one (1) conviction for the purpose of determining prior convictions." *Id*. § 40-35-108(b)(4).

Defendant contends that the four 1990 theft offenses should be counted as one offense, and that the 1986 petit larceny conviction should be considered a misdemeanor in determining his offender classification. At the sentencing hearing, the State introduced certified copies of Defendant's judgments for his four 1990 theft convictions showing that the offenses were committed on June 6, 1990, June 7, 1990, and June 8, 1990. For range enhancement purposes, a "certified copy of the court record of any prior felony conviction, bearing the same name as that by which the defendant is charged in the primary offense, is prima facie evidence that the defendant named therein is the same as the defendant before the court, and is prima facie evidence of the facts set out therein." *Id.* § 40-35-202(a).

Defendant does not argue that the information on the judgment forms is inaccurate, nor did he offer evidence that the June 6 offense was committed within twenty-four hours of the June 7 offenses, or that the June 7 offenses were committed within twenty-four hours of the June 8 offense. *See State v. Cory Shane Rollins*, No. E2008-01407-CCA-R3-CD, 2010 WL 342653, at *15 (Tenn. Crim. App., at Knoxville, Feb. 1, 2010), *perm. to appeal denied* (Tenn. June 17, 2010) (citing *State v. Freddie T. Inman, Jr.,* No. W2004-02371-CCA-R3-CD, 2005 WL 729149, at *10 (Tenn. Crim. App. at Jackson, Mar. 30, 2005), *perm. to appeal denied* (Tenn. Aug. 29, 2005); *John Roy Polly,* No. M1999-00278-CCA-R3-CD, 2000 WL 1606586, at *3 (Tenn. Crim. App., at Nashville, Oct. 27, 2000), *no perm. to appeal filed* (holding that "where the defendant seeks the application of the twenty-four hour rule and the relevant convictions occur on different days, it is the defendant's responsibility to demonstrate that the two offenses occurred within twenty-four hours of each other")).

Nonetheless, the trial court considered the two offenses occurring on June 7, 1990, and the offense on June 8, 1990 as one offense for offender classification purposes. The trial court found that "by necessity" the offenses on June 6, 1990, and June 8, 1990, would have been committed more than twenty-four hours apart, and therefore considered the four theft offenses as two offenses in determining Defendant's career offender status.

Even assuming *arguendo*, that the four 1990 theft offenses are considered as one offense under the twenty-four hour merger rule, Defendant would still have six prior Class D, Class C, and Class E felony convictions, including his petit larceny conviction, which would support his career offender classification as to the felony theft and felony vandalism convictions.

We observe that Defendant argues for the first time on appeal, and without citation to authority, that the 1986 petit larceny offense is a misdemeanor for purposes of offender classification. *See* Tenn. Ct. Crim. App. R. 10(b) (stating that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court"). Nonetheless, Defendant committed the petit larceny offense prior to the enactment of the 1989 Sentencing Act. *See* T.C.A. § 39-3-1103 (1986) (repealed) (defining petit larceny as "the felonious taking and carrying away of personal goods . . . not exceeding in value two hundred dollars ($200)"). For purposes of determining the classification of this offense, Defendant's petit larceny conviction is considered as a Class E felony. T.C.A. § 40-35-118. Thus, the offense may be taken into consideration in determining Defendant's offender classification.

Because Defendant had the requisite number of prior felony convictions to qualify as a career offender pursuant to Tennessee Code Annotated section 40-35-108, the trial court

was obligated to sentence Defendant as a career offender for his Class D and Class E felony convictions. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the record, we remand to the trial court solely for the purpose of correcting the judgments to accurately reflect the effective thirty-year sentence intended by the trial court. In all other aspects, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE